**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **MARION P. DEMOSS, BARBARA J. GALYEN, and PATRICIA J. KELLEY,** | ) ) ) | |
| **Plaintiffs,** | ) ) | **Case No. 3:07-0405** |
| | ) | **Judge Trauger** |
| **v.** | ) ) | |
| **TERRY L. KRETZ, GEORGE THORPE, and MICHAEL C. LYNN,** | ) ) ) | |
| **Defendants.** | ) ) | |

## <u>MEMORANDUM</u>

Several motions for summary judgment are pending before the court in this case, which involves a substantial number of common law claims, along with federal and state statutory claims, all arising from the failure of an investment company at which the defendants were employed. Defendants Michael C. Lynn and George Thorpe have both independently moved for summary judgment as to the claims the plaintiffs have asserted against them. (Docket Nos. 96 and 110, respectively.) The plaintiffs, Marion P. Demoss, Barbara J. Galyen and Patricia J. Kelley, have moved for summary judgment on their claims against defendant Terry L. Kretz. (Docket No. 100.) Further, the plaintiffs have moved for partial summary judgment as to three issues, asserting as a matter of law that: (1) the promissory notes at issue in this case are securities for purposes of state and federal law (Docket No. 73); (2) defendant Lynn is a "control person" with responsibility under state and federal law for issuing unregistered securities to the plaintiffs (Docket No. 103); and (3) defendant Thorpe is also such a "control person." (Docket No. 106.) For the reasons discussed herein, the plaintiffs' partial motion for summary judgment

1

on the issue of whether the promissory notes at issue are securities will be granted. Also, the summary judgment motions of defendants Lynn and Thorpe will be granted, and the plaintiffs' partial motions for summary judgment regarding whether these defendants were "control persons" will be denied. Finally, the plaintiffs' motion for summary judgment on their claims against defendant Kretz will be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

This case involves a Nashville, Tennessee investment company, Hanover Corporation, LLC ("Hanover"), which declared bankruptcy in 2006.[1] Defendant Kretz formed Hanover in 2002 under the laws of Tennessee as a member-managed LLC, and the company was initially focused on investing in the stock market. Over the next few years, however, Kretz shifted Hanover's focus from investing in the stock market to investing in businesses, including small "start-up" companies. In March 2004, Kretz hired defendant Thorpe to assist with Hanover's office expansion and to work closely with Kretz on investment development. While Thorpe was not particularly knowledgeable about securities, Kretz frequently consulted with him on investment decisions and had Thorpe attend high-level meetings with potential investors. Thorpe also served on the board of directors of several of the small "start up" companies in which Hanover invested, and he performed administrative tasks such as signing checks.

In January 2005, Hanover hired defendant Lynn, an experienced securities trader, to

---

[1] Unless otherwise noted, the facts are drawn from the parties' various statements of material facts (Docket Nos. 75, 88, 89, 92, 97, 102, 105, 108, 112, 122, 127, 129, 133, 134, 136, and 140) and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

2

oversee Hanover's "trading room," that is, the office in which trades were conducted and markets were tracked. While Lynn's primary duties at Hanover involved running the trading room, he was also Hanover's Chief Operating Officer and, in this senior position, had occasion to sign promissory notes for investors on behalf of Hanover, design promotional materials, and occasionally speak to investors and potential investors who called Hanover or visited the trading room.

Hanover was not a successful company. Post-2004, Hanover's business plan was to locate individual investors who, via a promissory note between the investor and Hanover, would turn over a substantial sum of money to Hanover for investment. In these promissory notes, Hanover promised substantial rates of return, up to twenty-five percent per year. Hanover was supposed to generate the money to pay off the interest on these notes (as well as fund all of its other costs) through success in the trading room and through the investment insights of Kretz and Thorpe. That strategy was a failure. As of October 2005, Hanover was obligated on 135 promissory notes, had lost $6,000,000 that year alone, had a negative net worth, and was the subject of an, ultimately abandoned, investigation by the Tennessee Securities Division.

The plaintiffs are three individuals who all lost a substantial sum of money investing with Hanover. In November 2005, plaintiff DeMoss met with Daryl Bornstein, a Hanover employee, to discuss Hanover and the financial opportunities it offered. Bornstein, relying on the impressions he developed from listening to Kretz and Thorpe talk to other potential investors, represented to DeMoss that Hanover was well-capitalized.[2] Following this meeting, DeMoss

_____

[2]In his affidavit, Bornstein also stated that he spent "prolonged periods" in the trading room, watching Lynn and his subordinates trade options, and, while he "did not understand what they were doing with all of the charts," Bornstein left those sessions with the impression that

3

decided to invest $350,000 through a promissory note made between herself and Hanover (signed by Kretz on behalf of Hanover), bearing interest at the rate of 1.65 percent per month, and maturing thirty-six months from its signing date of November 14, 2005. (Docket No. 86 Ex. 5.)

Also in the fall of 2005, plaintiff Galyen had a conversation with Hanover note holder Gary Bauer, who spoke very positively of Hanover's investment strategy and strength as a company. Based on this conversation, and apparently based on an April 4, 2006 conversation with Kretz, Galyen ultimately decided to invest $50,000 through a promissory note made between herself and Hanover (signed by Lynn on behalf of Hanover), bearing interest at two percent per month, and maturing nine months from its signing date of April 10, 2006.[3] (Docket No. 86 Ex. 7.)

In mid-March 2006, plaintiff Kelley likewise learned of Hanover from Gary Bauer. A week after speaking with Bauer, Kelley e-mailed Kretz about the opportunities Hanover offered. After speaking with Kretz and researching Hanover on the internet, Kelley ultimately decided to invest $100,000 through a promissory note made between herself and Hanover (signed by Lynn on behalf of Hanover), bearing interest at 1.5 percent per month, and maturing nine months from its signing date on April 10, 2006. (Docket No. 86 Ex. 6.)

Hanover "was making 5% to 8% per month trading options which was used to pay interest to the note holders and pay my salary." (Docket No. 130 Ex. 1.) He also relied on this, seemingly baseless, impression in making his pitch to Demoss. (*Id.*)

[3] At her deposition, Galyen stated that she may have spoken with Lynn on the telephone prior to investing, but she is ultimately not sure with whom she spoke. Lynn denies having spoken with her, and the substance of this purported conversation was not made clear in discovery.

4

The promissory note agreements that each of the plaintiffs made with Hanover restricted the areas in which the plaintiffs' money could be invested: "unless otherwise agreed in writing by the parties, the proceeds of the Loan shall be invested at the exclusive direction of [Hanover], provided however, [Hanover] shall only make investments in the following areas: (1) money market funds, (2) options, (3) options on real estate, (4) Bonds, (5) Treasury's, (6) Bank Notes, (7) Equity Investments, and (8) [Hanover's] operating capital." (See e.g. Docket No. 86 Ex. 5.)

As a general matter, Hanover did not abide by the restrictions on the areas of potential investment outlined in the plaintiffs' promissory notes. For instance, without discussing its decision with investors, Hanover made investments in foreign currency, including the Iraqi dinar. Hanover also donated thousands of dollars of investor money to the Cornerstone Church and used $600,000 in investor money to purchase a lot at the Fairview Plantation subdivision in Kretz's name. As these and many other investments failed to produce a positive return, Hanover eventually used the funds injected by new investors to make interest payments to existing note holders, something which, as the plaintiffs point out, is known as a "ponzi scheme."

By Spring 2006, Hanover was unable to furnish the interest payments to its investors. Following a series of failed, last ditch efforts to raise money, Hanover declared bankruptcy, resulting in massive losses for Hanover's investors, including the plaintiffs, none of whom received their principal investment back. In addition, while DeMoss received several interest payments while she was a Hanover note holder, Galyen never received a single interest payment, and Kelley only received one partial payment of $1,000 in April 2006. Hanover officially closed its doors on October 9, 2006.

The plaintiffs filed this action on April 12, 2007, and filed their amended, operative

5

complaint on June 30, 2008. As noted above, the parties have engaged in a substantial amount of summary judgment briefing. With one exception, these motions have been fully and exhaustively briefed. Defendant Kretz, proceeding *pro se*, has failed to submit a timely response to the plaintiffs' motion for summary judgment against him.[4]

## ANALYSIS

The plaintiffs allege that each of the three defendants in this case committed numerous common law and federal and state statutory violations. For common law claims, the plaintiffs allege that the defendants engaged in negligent misrepresentation, fraudulent misrepresentation, and conversion. (Docket No. 62 at 8-11.) As to federal statutory violations, the plaintiffs allege that the defendants violated federal securities laws, that is, 15 U.S.C. § 78j, 15 U.S.C. § 77q, 15 U.S.C. § 77l, 15 U.S.C. § 77o, and 15 U.S.C. § 78t. (*Id.* at 11-16.) As to state statutory violations, the plaintiffs allege that the defendants violated Tennessee securities law, that is, T.C.A. § 48-2-104. (*Id.* at 16-17.) Based on plaintiff Demoss' residence in Tennessee, plaintiff DeMoss also alleges violations of state securities law embodied in T.C.A. § 48-2-109(a) and T.C.A. § 48-2-121(a), along with violations of the Tennessee Consumer Protection Act, T.C.A.§ 47-18-101. (*Id.* at 17-19.) Based on plaintiff Kelley's residence in Wisconsin, plaintiff Kelley also alleges violations of Wisconsin securities law embodied in Wis. Stat. § 551.21, § 551.31, § 551.41, § 551.43, along with violations of Wisconsin's consumer protection statute, Wis. Stat. § 100.18. (*Id.* at 19-24.) Based on plaintiff Galyen's residence in California, plaintiff Galyen alleges violations of California securities law embodied in Cal. Corp. Code § 25110, § 25210, §

---

[4] That response was due on December 5, 2008. (Docket No. 120.) Kretz also never filed a response to the plaintiffs' partial motion for summary judgment regarding whether the promissory notes are securities.

25216, § 25401, § 25403, along with violations of California's consumer protection act, Cal. Civil Code § 1770.  (*Id.* at 24-29.)  As noted above, defendants Thorpe and Lynn have moved for summary judgment on the claims against them, and the plaintiffs, in addition to three partial motions for summary judgment, have moved for summary judgment against defendant Kretz – a motion that the court will examine without the benefit of a response from defendant Kretz.

**I.      Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'"  *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary

judgment as a matter of law.  *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999).  To preclude summary judgment, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).  If the evidence offered by the non-moving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the non-moving party, the motion for summary judgment should be granted.  *Anderson*, 477 U.S. at 249-52.  "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

## II.     Defendant Lynn's Motion For Summary Judgment

In his thorough, sixty-five page summary judgment brief, defendant Lynn argues that he is entitled to summary judgment on the claims that the plaintiffs have asserted against him. While the plaintiffs have asserted a bevy of claims, Lynn effectively argues that, because (1) he had no relevant communication with the plaintiffs in this case and (2) he never sold a security to the plaintiffs in this case, he is entitled to summary judgment.  As the court finds Lynn's arguments well-founded, summary judgment will be granted in his favor.

### A.     The Misrepresentation Claims

The plaintiffs' claims of negligent and fraudulent misrepresentation fail as a matter of

law unless they can show that the defendant, among other things, supplied false or misleading information to them. *See Robinson v. Omer*, 952 S.W.2d 423, 427 (Tenn. 1997) (negligent misrepresentation); *Metropolitan Government of Nashville and Davidson County v. McKinney*, 852 S.W. 2d 233, 237 (Tenn Ct. App. 1992) (fraudulent misrepresentation). The plaintiffs have come forth with no evidence of any communication whatsoever between Lynn and Demoss, and, as to Galyen and Kelley, they can only assert that Lynn happened to sign, plainly on behalf of Hanover, the promissory note, which represents that it is a promise between Hanover and the plaintiff, not between Lynn and the plaintiff. (See e.g. Docket No. 86 Ex. 6.) Therefore, it is not necessary to examine the remaining elements of the torts at issue (scienter, reliance, damages, etc.) as it is clear that the plaintiffs' misrepresentation claims fail regardless.

**B.      Conversion**

To be liable for conversion, a defendant, for his own benefit, must have intentionally exercised dominion over the plaintiff's property in a manner inconsistent with the plaintiff's rights. *Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W. 2d 833, 836 (Tenn Ct. App. 1977). Contrary to the plaintiffs' claim that Lynn took the plaintiffs' money as a "conversion agent," there is nothing to show that Lynn had any involvement with these plaintiffs such that he could have personally exercised dominion over their money. (Docket No. 126 at 15.) While Lynn may have known that some or all of these plaintiffs were investing money with Hanover, that is hardly evidence that Lynn exercised control over the plaintiffs' money, and, therefore, defendant Lynn is entitled to summary judgment on the plaintiffs' conversion claim.

**C.      Federal Securities Law Violations**

9

As an initial matter, the court finds, as a matter of law, that the promissory notes at issue in this case are securities, and, therefore, the court will grant the plaintiffs' partial motion for summary judgment on that issue. (Docket No. 73.) In *Reves*, the Court pointed out that, under federal law, a security is defined "to encompass virtually any instrument that might be sold as an investment." *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990). Indeed, every note is presumed to be a security, and that presumption can only be rebutted by applying a four-part test to show that the note at issue represents a family of instruments that are not considered securities. *Id.* at 67.

Here, all of the factors outlined in *Reves* point to these promissory notes being securities: (1) the parties' motives were to finance investments and make a profit; (2) there was a "plan of distribution" of these notes to the general public; (3) the reasonable expectation of the public who invested appears to have been to make money through investing; and (4) no factors indicate anything about these instruments that would reduce the risk of the instruments rendering application of the Securities Acts unnecessary. *Id.* While the court recognizes the point of defendants Lynn and Thorpe that these instruments were occasionally referred to as "loans," the Supreme Court has plainly indicated that the presumption of security status is not rebutted by a game of semantics, but rather by considering how the parties actually viewed the transaction. Here, the undisputed facts show that both parties viewed these instruments as a profit-generating way to finance investments, which places the instruments squarely in the "security" realm under the *Reves* test. *See id.* Therefore, the plaintiffs' partial motion for summary judgment on this issue will be granted.[5]

_____

[5] A few points of clarification are in order. One, these notes are also securities for purposes of the state law causes of action before the court. Wisconsin and California courts

10

## I. 15 U.S.C. § 78j(b) (Section 10(b) of the '34 Act)

A violation of this statute requires that the plaintiffs show, among other things, a misstatement or omission of material fact, in connection with the sale of a security. *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 570 (6th Cir. 2008). Again, defendant Lynn persuasively argues that, because he had no relevant communication with these plaintiffs prior to the execution of the promissory notes, he is not liable under this statute. (Docket No. 99 at 27.) In response, the plaintiffs can only weakly argue that whatever Lynn did to make Bornstein believe that the trading room was making five to eight percent per month should be deemed a statement by Lynn to DeMoss, and that Lynn made a statement to Galyen and Kelley by signing the promissory notes. (Docket No. 126 at 18-19.) The first argument clearly requires an impermissible level of speculation and inference unsupported by the facts, and, as to the second argument, again, it is clear that, whatever promises and statements were made in the promissory notes, they were made by Hanover, not Lynn. Therefore, defendant Lynn is entitled to summary judgment on this claim as well.

### ii.    15 U.S.C. § 77q (Section 17(a) of the '33 Act)

For present purposes, a violation of this provision occurs when the defendant makes a

---

appear to have adopted the *Reves* factors (or substantially similar factors) when analyzing whether an instrument is a security for purposes of their respective state securities laws. *See State v. McGuire*, 302 Wis. 2d 688, 700 (Wis App. 2007); *Agnew v. California State Bd. of Equalization*, 2003 WL 21464990, *10 (Cal. Ct. App. June 25, 2003) (unpublished, not for citation); *People v. Rangel*, 2002 WL 1445254, *23 (Cal. Ct. App. July 2, 2002) (unpublished, not for citation). Also, the Sixth Circuit, recognizing the similarly between Tennessee and federal securities law, has applied the *Reves* test to claims under Tennessee securities law. *See Bass v. Janney Montgomery Scott, Inc.*, 210 F.3d 577, 584-85 (6th Cir. 2000). Two, the plaintiffs have effectively argued, by widely canvassing the case law, that the duration of the notes at issue should not be a concern for the court in analyzing these issues. (Docket No. 74 at 13.)

11

misrepresentation or omission of material fact in connection with the sale of a security. *SEC v. George*, 426 F.3d 786, 792 (6th Cir. 2005). As above, defendant Lynn argues that he had no relevant communication with the plaintiffs, and the plaintiffs respond by arguing that Lynn signed two of the promissory notes and that Bornstein emerged from his visits to Lynn's area of the office with a false impression of Hanover's success. (Docket No. 126 at 21-22.) Therefore, for the reasons discussed above, defendant Lynn is entitled to summary judgment on this claim as well.

### iii.     15 U.S.C. § 77l (Section 12(a)(1) of the '33 Act)

This provision of federal securities law imposes liability on one who either sells an unregistered security or successfully solicits the sale. *Pinter v. Dahl*, 486 U.S. 622, 647 (1988). Liability does not extend to those collateral to the sale. *Id*. at 650. As noted above, defendant Lynn was only involved in the sale of the securities in this case to the extent that, plainly as an agent of the seller Hanover, he happened to be the individual who signed two of the promissory notes in this case on behalf of the company. (Docket No. 99 at 32-33, Docket No. 126 at 23.) Because of his mere collateral involvement with the securities sales in this case, defendant Lynn is entitled to summary judgment on this claim as well.

### iv. 15 U.S.C. § 77o (Section 15 of the '33 Act)

This provision has been interpreted such that "a controlling person shares the liability for violations of securities laws with the primary violator it controlled." *Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 485 (6th Cir. 1992) (citing 15 U.S.C. § 77o and 15 U.S.C. § 78t). To establish control person liability, the plaintiff must at least establish that the defendant controlled the activities of the primary violator in general and that the defendant possessed the power to control the specific transaction on which the primary violation is

12

predicated, that is, here, the fraudulent sale of unregistered securities. (*Id.* at 486; Docket No. 104 at 11-16.) As defendant Lynn correctly argues, on these facts, whatever the alleged securities violation and whomever is considered the primary violator (*e.g.* Kretz, Thorpe, or Hanover) Lynn clearly was not the control person. (Docket No. 99 at 35-37.) The undisputed facts discussed above show that Lynn had a discrete role at Hanover, that is, running the trading room, and he did not have authority or control over anyone but his subordinates in the trading room and the administrative staff. Therefore, Lynn is entitled to summary judgment on this claim as well.

**v.     15 U.S.C. § 78t (Section 20(a) of the '34 Act)**

This provision likewise punishes "control persons" and requires a showing that the person who was subject to control committed an underlying securities law violation and that the controlling person directly or indirectly controlled that person. *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 696-97 (6th Cir. 2004). For the reasons discussed above, defendant Lynn does not have control person liability in this case, and, therefore, he is entitled to summary judgment on this claim as well.[6]

**D.     State Securities Law Violations**

**I.     T.C.A. § 48-2-104**

This statute provides that it is unlawful for a person to sell an unregistered security in Tennessee. T.C.A. § 48-2-104(a)(1). As discussed above when addressing the comparable

---

[6] The plaintiffs moved for partial summary judgment on the issue of whether defendant Lynn had control person liability and incorporated that motion into their response to Lynn's motion for summary judgment. (Docket No. 103.) As Lynn is entitled to summary judgment on the control person issue, the plaintiffs' partial motion for summary judgment on that issue will be denied.

13

provision of federal law, defendant Lynn can have no liability under this provision because he simply did not sell the securities at issue in this case. (Docket No. 99 at 38-41.) Therefore, Lynn is entitled to summary judgment on this claim.

### ii. T.C.A. § 48-2-109(a) (brought by DeMoss only)

This provision prohibits anyone from transacting securities business with an individual as a "broker-dealer" of securities or as an agent of such a broker-dealer without being registered in Tennessee. T.C.A. § 48-2-109(a). The plaintiffs assert that defendant Lynn has liability as an unregistered agent for Kretz because Lynn sold securities to the plaintiffs. (Docket No. 126 at 26-27.) Again, as to these plaintiffs, there is no evidence that Lynn sold anything and, therefore, Lynn is entitled to summary judgment on this claim.

### iii. T.C.A. § 48-2-121(a) (brought by DeMoss only)

This provision makes it unlawful for any person, in connection with the offer, sale or purchase of any security, to directly or indirectly, make any untrue statement of material fact or to fail to correct one's previous statement that created a justified misunderstanding. T.C.A. § 48-2-121(a). As discussed in detail above, the plaintiff's argument that defendant Lynn signed two promissory notes in this case and was a potential source of Bornstein's inaccurate information is simply insufficient proof that Lynn made an untrue statement of material fact or committed fraud by omission. (Docket No. 126 at 28.) Therefore, defendant Lynn is entitled to summary judgment on this claim as well.

### iv. T.C.A. § 47-18-101 (brought by DeMoss only)

This consumer protection provision punishes "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." T.C.A. § 47-18-104(a). Again, the evidence fails to show that the relationship between plaintiff DeMoss and defendant Lynn was such that

14

Lynn could have engaged in any deceptive conduct toward plaintiff DeMoss. Indeed, the two never spoke, and, as above, the plaintiff's allegation that Lynn signed promissory notes for other plaintiffs and was a potential source of inaccurate information for Bornstein is woefully insufficient to demonstrate deceptive behavior. (Docket No. 126 at 31-32.)

### v. Wis. Code. § 551.21 (brought by Kelley only)

This provision imposes liability upon any person who sells or offers to sell an unregistered security in Wisconsin. Wis. Code. § 551.21(1)(a). For the reasons discussed above, defendant Lynn did not sell a security in this case, and is, therefore, entitled to summary judgment on this claim.

### vi. Wis. Code § 551.31 (brought by Kelley only)

This provision imposes liability on people transacting securities business in Wisconsin as "broker-dealers" and "agents" without being registered as such in Wisconsin. Wis. Code. § 551.31. For the reasons mentioned above when discussing the comparable provision of Tennessee law (that defendant Lynn did not transact securities business with these plaintiffs), Lynn is entitled to summary judgment on this claim.

### vii. Wis. Code § 551.41 (brought by Kelley only)

This provision makes it unlawful for an individual, in connection with the sale of a security, to make any untrue statement of material fact or to fail to correct one's previous statement that created a justified misunderstanding. Wis. Code § 551.41. Again, as discussed in regards to the comparable provision of Tennessee law, the plaintiffs have failed to show that defendant Lynn made any such statement to these plaintiffs, and, therefore, Lynn is entitled to summary judgment on this claim as well.

### viii. Wis. Code § 551.43 (brought by Kelley only)

15

This provision makes it unlawful for a broker-dealer to use fraudulent means to induce or effect the sale of a security. Wis. Code § 551.43. As discussed above, there is no evidence that defendant Lynn used fraudulent means in his interactions with plaintiff Kelley (which were essentially non-existent) or was a broker-dealer. Therefore, Lynn is entitled to summary judgment on this claim as well.

### ix. Wis. Code § 100.18 (brought by Kelley only)

Establishing a claim under this consumer protection provision of Wisconsin law requires, among other things, that the defendant have made an untrue statement of fact to the public. Wis. Code. § 100.18. Obviously, nothing about the facts of this case suggests that defendant Lynn made any such statement to the public. Therefore, Lynn is entitled to summary judgment on this claim as well.

### x. Cal. Corp. Code § 25110 (brought by Galyen only)

This provision prohibits the offer or sale of an unregistered or otherwise improper security in California. Cal Corp. Code § 25110. For the reasons addressed above when discussing comparable provisions of Tennessee and Wisconsin law, defendant Lynn is entitled to summary judgment on this claim because he did not sell any securities in this case. (Docket No. 99 at 55.)

### xi. Cal. Corp. Code § 25210 and § 25216 (brought by Galyen only)

Code provision 25210 prohibits unregistered broker-dealers and agents from effecting the sale of securities. Cal Corp. Code § 25210. For the reasons addressed above when discussing comparable provisions of Tennessee and Wisconsin law, defendant Lynn is entitled to summary judgment on this claim. Further, code provision 25216 prohibits broker-dealers or agents from using deceptive techniques to effectuate the sale of securities. Cal Corp Code §

16

25216.  Again, as discussed above, there is no evidence that Lynn used fraudulent or deceptive means in his very limited interactions with these plaintiffs, and, therefore, Lynn is entitled to summary judgment on this claim as well.

### xii.    Cal. Corp. Code § 25401 (brought by Galyen only)

This provision makes it unlawful for an individual, in connection with the sale of a security, to make any untrue statement of material fact or to fail to correct one's previous statement that created a justified misunderstanding.  Cal. Corp. Code § 25401.  Again, defendant Lynn did not sell the security at issue here or make misleading statements to the plaintiffs, and, therefore, is entitled to summary judgment on this claim as well.  (Docket No. 99 at 59.)

### xiii.    Cal. Corp. Code § 25403 (brought by Galyen only)

This provision deals with control person liability under California law, with a standard for control that, for present purposes, is largely identical to the standard under federal law.  Cal. Corp. Code § 25403.  For the reasons discussed under the comparable sections of federal law, defendant Lynn did not act as a control person in this case and, therefore, does not have control person liability.

### xiv.    Cal. Civ. Code § 1770(a) (brought by Galyen only)

This consumer protection provision prohibits, among other things, unfair and deceptive acts or practices, including dishonest representations, in consumer transactions.  Cal. Civ. Code. § 1770(a).  For all the reasons addressed above, imposing such liability on defendant Lynn would be inappropriate, given the facts of this case, which show that Lynn had virtually no interactions with plaintiff Galyen, except for, perhaps, a brief phone call the details of which are not revealed in the record.  Therefore, summary judgment will be granted as to defendant Lynn on this claim as well.

17

### E.      Summary

As defendant Lynn is entitled to summary judgment on every claim asserted against him,

his motion for summary judgment will be granted in full, the plaintiffs' partial motion for

summary judgment against defendant Lynn on the "control person" issue will be denied, and

defendant Lynn will be dismissed from this case.

## III.    Defendant Thorpe's Motion for Summary Judgment

Now that the court has examined defendant Lynn's motion claim-by-claim, defendant

Thorpe's motion, which is in response to the exact same claims, can be examined more

efficiently.  First, defendant Thorpe argues that he did not communicate with any of the plaintiffs

and, therefore, cannot be liable under the common law, federal, and state causes of action that

are premised on the defendant's having communicated with the plaintiff.[7]  (See e.g. Docket No.

111 at 24.)  Second, Thorpe argues that he had no role in the actual sale of the securities at issue

in this case, and, therefore, he cannot be liable under state and federal securities laws that

prohibit securities sales by unauthorized individuals or sales that occur in a dishonest or

unauthorized way.[8]  (See e.g. Docket No. 111 at 31)   Third, Thorpe argues that, because he was

essentially Kretz's "executive assistant" and knew very little about securities, he cannot be

considered a "control person" and, therefore, has no liability under the federal and state laws that

impose control person liability.[9]  (See e.g. Docket No. 111 at 36.)  Finally, Thorpe argues that,

---

[7] That is, negligent and fraudulent misrepresentation, 15 U.S.C. § 78j(b), 15 U.S.C. § 77q, T.C.A. § 48-2-121(a), T.C.A. § 47-18-101, Wis. Code § 551.41, Wis. Code § 551.43, Wis. Code § 100.18, Cal. Corp. Code § 25216, Cal. Corp. Code § 25401, and Cal. Civil Code § 1770(a).

[8] That is, 15 U.S.C. § 77l, T.C.A. § 48-2-104, T.C.A. § 48-2-109(a), Wis. Code. § 551.21, Wis. Code § 551.31, Cal. Corp. Code § 25110, and Cal. Corp. Code § 25210.

[9] That is, 15 U.S.C. § 77o, 15 U.S.C. § 78t, and Cal. Corp. Code § 25403.

because he neither took the plaintiffs' money nor exercised dominion over it, he cannot be liable for common law conversion. (Docket No. 111 at 49.)

On the first point dealing with misrepresentations, the plaintiffs allege that defendant Thorpe made indirect misrepresentations to Bornstein. Here, the allegation is that Bornstein attended meetings with Thorpe and Kretz, in which they indicated that all was well at Hanover, and then Bornstein went out and communicated this message to other potential investors, including, possibly, the plaintiffs in this case. (Docket No. 128 at 8-10.) This heavily attenuated and speculative basis for liability is plainly insufficient to maintain a claim under any of the statutes or common law causes of action discussed above.

On the second point dealing with selling securities in an unauthorized manner or in a dishonest or unauthorized way, the plaintiffs, again, can only offer the same indirect speculation. (Docket No. 128 at 14.) Again, Hanover sold the securities at issue here, not defendant Thorpe, and Thorpe's providing his opinion on the status of the company to another employee, who then may have used that information in making a sales pitch, hardly amounts to sufficient participation in the sale.

On the third point, defendant Thorpe was clearly not a control person. All of the evidence in this case suggests that, whatever his official title, Thorpe was Kretz's assistant. He provided insight on companies he knew something about, but Thorpe had no control over securities transactions generally or the securities transactions in this case. Further, the plaintiffs' assertions, supported by deposition testimony, reveal that Thorpe had no control over Kretz. Indeed, when he told Kretz that he thought the Tennessee Securities Division investigation into Hanover should be revealed to the note holders, Kretz refused to disclose it. (Docket No. 107 at 11.) Also, when Thorpe suggested to Kretz that the note holders be informed

19

of Kretz's plan to transfer money from Hanover to an off-shore account, Kretz again refused. (*Id.* at 12.) Again, the facts show that Thorpe and Kretz were close, but it was Kretz who was firmly in charge of the decisions, good or bad, made at Hanover.[10]

Finally, as to their conversion claim, the plaintiffs abandon their indirect liability argument and argue that, because defendant Thorpe continued to receive a salary while the "back end" of the "ponzi scheme" exploded, Thorpe is somehow liable for conversion. (Docket No. 128 at 33.) In summary, the plaintiffs argue, "Mr. Thorpe had actual notice he was taking money from investors. He knew many of them by name. Whether or not he knew [the plaintiffs] by name is not relevant. He believed that all note holders were greedy and would get what they deserve." (Docket No. 128 at 34.) Again, it is not clear how any of this relates to the elements of a claim for common law conversion, and there is no evidence that Thorpe exercised dominion over the plaintiffs' money, as would be required, among other things, to state such a claim. (Docket No. 111 at 48.)

In sum, as to defendant Thorpe, the plaintiffs' theory of liability is that Thorpe talked to others at Hanover and other potential investors and, indirectly, his statements, some of which were allegedly untrue, made their way to other potential investors, including, potentially the plaintiffs. This theory of liability is ill-suited to all of the claims advanced by the plaintiffs. Therefore, defendant Thorpe's motion for summary judgment will be granted, the plaintiffs' partial motion for summary judgment asserting that defendant Thorpe was a "control person"

---

[10] The plaintiffs moved for partial summary judgment on the issue of whether defendant Thorpe had control person liability and incorporated that motion into their response to defendant Thorpe's motion for summary judgment. (Docket No. 106.) As Thorpe is entitled to summary judgment on the control person issue, the plaintiffs' partial motion for summary judgment on that issue will be denied.

20

will be denied, and defendant Thorpe will be dismissed from this case.

## IV.  The Plaintiffs' Motion For Summary Judgment as to Defendant Kretz

The plaintiffs are not entitled to summary judgment on their claims against defendant Kretz solely because Kretz has failed to respond to the plaintiffs' summary judgment motion.  As the Sixth Circuit has stated: "a district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded.  The court is required, at a minimum, to examine the movant's motion for summary judgment to ensure that he has discharged [his initial] burden ... The federal rules require that the party filing a motion for summary judgment always bears the burden of demonstrating the absence of a genuine issue as to a material fact."  *Stough v. Mayville Cmty. Schs.*, 138 F.3d 612, 614 (6th Cir. 1998.) (citing *Carver v. Bunch*, 946 F.2d 451, 455 (6th Cir. 1991)).

As discussed above, defendant Kretz clearly performed a series of troubling maneuvers while he was in charge of Hanover, including using $600,000 of investor money to buy himself a personal residence.  That said, before the plaintiffs can be entitled to summary judgment, they must effectively argue, applying the appropriate law to the facts, why defendant Kretz is liable under the particular theory offered.  Even taking their undisputed statement of material facts as true, the plaintiffs, as shown below, have failed to make the required showing in their motion for summary judgment and, therefore, the plaintiffs' motion will be denied.  The court is in no way suggesting that Kretz should be free of legal liability for his conduct.

### A.  The Misrepresentation Claims

As to defendant Kretz, the plaintiffs' claims of fraudulent and negligent misrepresentation are based on the statement in each plaintiff's promissory note that the plaintiff's money would be used for only eight, explicitly mentioned, purposes.  (Docket No. 101

21

at 7.)  The plaintiffs point out that, on a general level, the money invested with Hanover did not always go toward these eight purposes, as investor money was used, among other things, to invest in start-up companies, to donate to a church, to buy Kretz a home, and to make interest payments to other investors.  (*Id.* at 7-8.)  The plaintiffs then go on argue that, because Kretz testified that he knew, as of 2005, that some investor money was going to pay the interest on other notes, an intent to deceive these plaintiffs can be inferred.  (*Id.* at 9-10.)  Finally, the plaintiffs argue that they relied on the representation in their notes that their money would only be used in relatively safe investments, and that they would not have invested otherwise.  This, the plaintiffs argue, makes the falsity of the statement in the promissory notes the proximate cause of the plaintiffs' injuries.  (Docket No. 10-11.)

The plaintiffs, however, simply ignore the fact that the promissory notes were not made by defendant Kretz but were made by Hanover as a corporate entity.  (See e.g. Docket No. 86 Ex. 5.)  The plaintiffs make no argument that the court should "pierce the corporate veil," or suggest anything improper about the conversations Kretz allegedly had with some of the plaintiffs in this case, and essentially ask the court to simply ignore the fact that it was Hanover, not Kretz, who made these promises.  Therefore, the plaintiffs are not entitled to summary judgment on their misrepresentation claims.

      **B.**        **Federal and State Securities Claims**

In their brief, the plaintiffs break up their federal and state securities claims into four groups, each premised on a different theory of liability: (1) that defendant Kretz sold unregistered securities in violation of state and federal law; (2) that Kretz made untrue statements or failed to disclose material facts in connection with the sale of securities in violation of state and federal law; (3) that Kretz has "control person" liability under state and federal law;

and (4) that Kretz is an unlicensed "broker dealer" under state law.  The court will consider each group in turn.

## I.      Sale of unregistered securities

The plaintiffs allege that defendant Kretz is liable under 15 U.S.C. § 77l (the '33 Act), 15 U.S.C. § 78j (the '34 Act), T.C.A. § 48-2-104, Wis. Stat. § 551.21, and Cal. Corp. Code § 25110 for selling unregistered securities.  As noted above, the *Pinter* case interprets 15 U.S.C. § 77l to impose liability on anyone who sells an unregistered security and, importantly, upon anyone who solicits the sale of an unregistered security.  *Pinter*, 486 U.S. at 642, 646-47.  Without directly discussing the solicitation issue, the plaintiffs argue that the other provisions of state and federal law prohibiting the sale of unregistered securities should be interpreted consistently with 15 U.S.C. § 77l and *Pinter*.  (Docket No. 101 at 12-13.)

The problem with the plaintiffs' argument is the same as the problem identified above, which is that they make no argument addressing the fact that, on the face of the promissory notes at issue, Kretz did not sell the notes; Hanover did.  In fact, the plaintiffs even explicitly state, "[a]s the entity who issued the notes, Hanover Corporation, LLC is liable for selling the unregistered securities."  (*Id.* at 13.)   Further, even assuming that the Supreme Court's holding in *Pinter* applies to all of the statutes raised in this section, the plaintiffs have come forth with insufficient evidence that Kretz solicited any of the plaintiffs in this case.  The plaintiffs provide no legal standard for what amounts to solicitation and cannot avoid the undisputed fact that each of the plaintiffs sought out Hanover for investment, not the other way around.  The plaintiffs do point out that Kretz apparently spoke on the phone with both Kelley and Galyen prior to those plaintiffs investing in Hanover and that Kretz apparently sent Galyen a packet of information about Hanover, but the plaintiffs provide no details on the substance of those conversations, who

23

requested the packet, and, again, no standard by which the court could judge whether or not defendant Kretz solicited these plaintiffs. *Id.* at 13-14. Therefore, the plaintiffs are not entitled to summary judgment on these claims.

### ii. Untrue statements and omissions in connection with sale

The plaintiffs allege that defendant Kretz is liable under 15 U.S.C. § 78j (the '34 Act), 15 U.S.C. § 77q (the '33 Act), T.C.A. § 48-2-121(a), Wis. Stat. § 551.41, and Cal. Corp. Code § 25401 for making untrue statements and failing to disclose material facts in connection with the sale of the notes in this case. (Docket No. 101 at 14.)

Again, in large part, the plaintiffs premise their claims here on the notion that the statements in the plaintiffs' promissory notes as to how the plaintiffs' money would be invested were false. (Docket No. 101 at 16.) Again, as discussed above, the problem with this argument is that, facially, the promises made in the plaintiffs' notes are being made by Hanover, not the employees of Hanover, and the plaintiffs fail to raise any argument to deal with this issue. The plaintiffs also argue that, "[t]hroughout 2006, Defendant Kretz continued to misrepresent to the Plaintiffs that Hanover was performing well even after Plaintiffs inquired as to why they were not receiving the promised interest payments. In reality, Kretz knowingly and intentionally misrepresented the condition of the business to the Plaintiffs." (*Id.* at 17.) Assuming this allegation is relevant to claims that involve the sale of securities, as opposed to post-sale interactions, this allegation is provided entirely without citation to facts of record, and, therefore, cannot be relied upon by the court.

The plaintiffs also argue that "Defendant Kretz failed to disclose a substantial amount of material information to the Plaintiffs." (*Id.*) Once again, despite their burden on summary judgment, the plaintiffs leave the court entirely at sea as to how the law should be applied to the

24

facts of this case.  In this section of their argument, the plaintiffs simply provide a lengthy list of issues that Kretz never told note holders of, but they fail to connect that list to any standard for materiality or standard of duty of an employee of a note seller.  (*Id.* at 17-18.)  While not disputing that these are troubling issues, the plaintiffs' burden here is much more than to simply outline the mistakes that Hanover made as a company.  To establish their claim here as a matter of law, the plaintiffs, among other things, must make some argument that shows why the issues here were material and why Kretz (who did not sell the securities at issue) had the duty to disclose these pieces of information.  Therefore, the plaintiffs' motion for summary judgment will be denied on these claims as well.

### iii.    Control person liability

The plaintiffs allege that defendant Kretz is liable under 15 U.S.C. § 77o (the '33 Act), 15 U.S.C. § 78t (the '34 Act), and Cal. Corp. Code § 25403 as a "control person."  (Docket No. 101 at 19.)  First, as to the California state claim, a California court recently ruled that no private right of action exists for violations for Cal. Corp. Code § 25403, and this court is bound to apply that decision, precluding judgment for the plaintiff as to that cause of action.  *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC.*, 158 Cal. App. 4th 226, 255 (Cal. App. 2007).

Considering the remaining claims, the plaintiffs cite the *Sanders* case addressed above, which states that an individual may be liable as a control person for a securities law violation if, at minimum, it is shown that: (1) the individual possessed the power to control the specific transactions or activity upon which the primary violation is predicated and (2) the individual actually exercised control over the operations of the violator in general.  *Sanders*, 973 F.2d at 486.  For purposes of this motion, the plaintiffs' allegation is that Hanover committed the primary violation of selling unregistered securities, and Kretz, as CEO and Chairman of the

25

Board of Directors, controlled Hanover.  (Docket No. 101 at 20-21.)

In their undisputed statement of facts, the plaintiffs state: "the promissory notes were not registered with any state or federal securities agency." (Docket No. 102 at 3.)  Even assuming for the moment that "the promissory notes" refers to the specific notes at issue this case, the citation provided by the plaintiff only points to deposition testimony from defendants Kretz and Lynn that simply does not support this statement.  Rather the deposition testimony cited discusses, without conclusion, whether the notes at issue were properly registered in individual states. (Docket No. 101 Ex. 1 at 185, Docket No. 101 Ex. 6 at 104.)  Therefore, the plaintiffs' vague statement in their undisputed statement of facts fails to support the existence of a primary violation.  Therefore, while substantial evidence exists that defendant Kretz was a control person, the plaintiffs are not entitled to summary judgment on these claims.

### iv.     "Broker-Dealer" liability

The plaintiffs allege that defendant Kretz is liable under T.C.A. § 48-2-109(a), Wis. Stat. § 551.31, and Cal. Corp. Code § 25210 because he was an unlicensed broker-dealer.  (Docket No. 101 at 22.)  In support of their argument, the plaintiffs only state: "Terry Kretz does not hold any federal or states securities licenses.  While defendant Kretz held licenses in the past, those licenses have lapsed.  Terry Kretz was not registered with the Tennessee Securities Division." (Docket No. 101 at 22.)  Whatever the actual merits of these claims, this argument is extremely vague, is offered based on the licenses Kretz currently holds and not on the licenses he held during the relevant time period, and is unconnected to any relevant law.  It is the plaintiffs' burden to explain what the law is and apply it to the facts; it is not the court's job to guess or to speculate as to what the plaintiffs are arguing.  Therefore, the plaintiffs' motion for summary judgment on these claims is denied.

26

### C. Consumer Protection Act Statutes

The plaintiffs allege that defendant Kretz is liable under T.C.A. § 47-18-104(b), Cal. Civil Code § 1770(a), and Wis. Stat. § 100.18 for engaging in deceptive trade practices under each state's consumer protection/deceptive trade practices act. (Docket No. 101 at 23.) The plaintiffs allege that "Defendant Kretz made intentional misrepresentations to the plaintiffs regarding the use of their investment in Hanover Corporation, LLC and failed to disclose that Hanover Corporation, LLC is a ponzi scheme." (Docket No. 101 at 23.) In support, the plaintiffs restate their allegation that the statement in the promissory notes as to how investments would be used was untrue. (*Id.*) In short, the plaintiffs are re-asserting that Kretz is ultimately responsible for the conduct of the business entity Hanover without providing any legal basis for that conclusion. Therefore, the plaintiffs' motion for summary judgment on these claims will be denied.

### D. Conversion

Finally, in the plaintiffs' one paragraph conversion argument they assert that, because the plaintiffs deposited money and Hanover used investor money to pay Kretz's salary and purchase personal property for him at Fairvue Plantation, Kretz, as a matter of law, is liable for conversion. (Docket No. 23-24.) As discussed above, establishing a claim for conversion requires that the plaintiff show that the defendant exercised dominion over the plaintiff's property in a manner inconsistent with the plaintiff's rights. *Mammoth Cave*, 569 S.W. 2d at 836. The plaintiffs fail, however, to effectively trace their specific deposits with Hanover to an improper use of their funds by Kretz. Therefore, the plaintiffs' motion for summary judgment on this claim will be denied.

### CONCLUSION

For the reasons discussed above, the summary judgment motions of defendants Lynn and Thorpe will be granted, and the plaintiffs' corresponding partial motions for summary judgment as to those defendants' "control person" liability will be denied. The plaintiffs' motion for summary judgment as to their claims against Terry Kretz will be denied, and the plaintiffs' partial motion for summary judgment as to the status of the promissory notes will be granted.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge.